IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-355-MSK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  **WAUNITA WEINGART**,
2.  JOHN PHILLIP GALLEGOS,
3.  ALOIS CRAIG WEINGART,

      Defendants.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Linda Kaufman and Martha Paluch, Assistant United States Attorneys for the District of Colorado, and the defendant, Waunita Weingart, personally and by counsel, Martin Adam Stuart of Portman Stuart, LLC, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I. AGREEMENT

This agreement is presented pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B).

The defendant agrees to plead guilty to Counts 3 and 6 of the Indictment, charging violations of 18 U.S.C. § 1343, wire fraud.

The government agrees to dismiss all remaining counts and to bring no additional charges against the defendant arising out of the facts now known to the United States Attorney's Office for the District of Colorado, and in particular potential bank fraud and related charges based upon mortgages acquired by the defendant's son, John Gallegos,

Court's Exhibit

1

for 7603 California Ave. SW, Seattle, Washington and 430 6th Avenue, Denver, Colorado.

The government further agrees to recommend that the defendant be sentenced within the guideline range as determined by the parties, as set forth below. The parties agree that the defendant is free to argue for a downward variance.

At this time, the government is unaware of any evidence to support a finding that the defendant is a flight risk or a danger to herself or others. ~~Absent changed circumstances,~~ ~~and for purposes of this plea,~~ the government agrees not to seek immediate remand of the defendant at the conclusion of the change of plea hearing or at the conclusion of the sentencing hearing. The parties acknowledge, however, that determinations regarding remand are left to the Court's sound discretion.

The parties agree that the loss in this case is approximately $9,607,365.46. However, the parties agree pursuant to 18 U.S.C. § 3663(a)(2) that the total amount of restitution is approximately $12,490,437.96. The defendant will be jointly and severally liable with any other defendant who may be convicted for offenses causing the same loss.

The parties agree that the sentencing of the defendant should be deferred until the conclusion of the trial or other disposition of the charges in this case against co-defendant Alois Craig Weingart.

The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after

2

determining the otherwise applicable sentencing guideline range, either departs or varies upward, or (3) the Court determines that the offense level is greater than 28 and imposes a sentence based upon that offense level determination. Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742. The defendant also knowingly and voluntarily waives her right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the court, the defendant is released from  this waiver provision.

## II. ELEMENTS OF THE OFFESES

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

(1)     the defendant knowingly devised or intended to devise a scheme to defraud or for obtaining money by means of false or fraudulent pretenses, representations, or promises,

(2)     acted with specific intent to defraud,

(3)     caused an interstate wire communication facility to be used for the purpose of executing the scheme, and

(4)     the scheme employed materially false pretenses,

3

representations, or promises.

### III. STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 1343 is: not more than 240 months' imprisonment; not more than a $250,000 fine, or both; not more than 5 years' supervised release; a $100.00 special assessment fee; plus restitution. The parties agree, pursuant to 18 U.S.C. § 3663(a)(3), that the restitution in this case is approximately $12,490,437.96. → § 3663 A(a)(1) and § 3663 A(a)(3)

LK
MP
WS

The Court will impose a separate sentence on each count of conviction and may, to the extent permitted by law, impose such sentences either concurrently with or consecutively to each other.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

### IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to

4

those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is July 2000.

The parties agree as follows:

1.      The defendant and Alois Craig Weingart acquired 7766 Saxeborough Drive, Castle Rock, Colorado (hereinafter "Saxeborough") in 1997 and resided there until June 2008. The defendant and John Gallegos acquired 141 Lost Angel Road, Boulder, Colorado in 2002. John Gallegos resided there both before and after he and the defendant acquired the property; the defendant never resided there. John Phillip Gallegos ("John Gallegos") is Waunita Weingart's son; Alois Craig Weingart ("Craig Weingart") is her husband.

2.      The defendant devised a scheme in which she, John Gallegos, and Craig Weingart each repeatedly obtained mortgage loans for the Saxeborough and Lost Angel properties, pledging the same properties again and again as collateral to each successive lender without paying off the prior loans. The first loan was made to the defendant and Craig Weingart on August 3, 2000, and the last was made to John Gallegos on April 21, 2008.

3.      The defendant was an experienced mortgage broker, settlement agent, and licensed title insurance producer. She used her skills as a mortgage broker, settlement

5

agent, and title insurance producer to provide false information and create fraudulent documents upon which the lenders would rely in approving and making the loans. For each new loan, she was able to make it appear that the borrower met the lender's qualifications, and that the lender would obtain a first priority security interest in the subject property.  In fact, she knew that the borrowers did not have sufficient legitimate income and assets to support their substantial debts and that the lenders would not receive first position priority security interests in Saxeborough or Lost Angel, the properties pledged as collateral for the loans.

4.      The defendant contacted various lenders to begin the loan application process for the new loans; at times, she had Gallegos or Craig Weingart do so. Many times, the defendant communicated with the lender through G-4 Holdings Company, LLC ("G-4 Holding Co."), the mortgage brokerage she controlled.

5.      Whenever the defendant used G-4 Holding Co. as a purportedly independent mortgage broker, she effectively prevented the lender from using a truly independent third party to gather the borrower's application information. In those instances, when one or both of the Weingarts were the borrowers, John Gallegos' name appeared on the application as the broker who had supposedly interviewed them; when John Gallegos was the borrower, Waun Weingart was named as the person who had supposedly interviewed him.

6.      In preparing the loan applications and providing information to the lenders for the applications, the defendant incorporated false representations as necessary to assure that the borrowers would qualify for the desired loans. She also created and sent the lenders false documents which served to support certain false representations in the applications. Where such documents required the borrower's signature, she either had

6

Craig Weingart or John Gallegos sign them, or simply forged their signatures.

7.    On each of the loan applications, the new loan was described as the refinancing of an existing loan secured by either the Saxeborough or the Lost Angel property. The loan applications falsely represented that the borrower had no more than one existing loan on which that property had been pledged as collateral. The defendant signed her own applications, and had Craig Weingart and John Gallegos sign theirs. On days when Gallegos was not available, she forged his signature.

8.    Each application substantially overstated the borrower's true legitimate income, representing that he or she had high monthly earnings from employment at companies whose names were slight variations of "Transaction Coordinator Services, LLC," (also referred to as "TCS"), one of the entities she controlled. In fact, Transaction Coordinator Services, LLC was a shell company that conducted no business of its own. On several occasions, the defendant submitted an altered version of her title insurance producer's license to support the false representations regarding Craig Weingart's employment and income on his loan applications, making it appear that he was a licensed insurance producer, when he was not. In fact, he was unemployed.

9.    On occasion, the defendant provided false social security numbers for herself and John Gallegos on the applications, a tactic which would have made it more difficult for the lenders to obtain their true credit histories. She also used the same false social security numbers when opening some of the bank accounts which were used in the scheme.

10.    As an experienced mortgage broker, the defendant knew that the lenders would use the borrower's credit report as an aid in determining his or her credit-worthiness.

7

Through G-4 Holding Co., she was able to obtain the borrower's current credit report before any application was submitted to the lender. She could therefore see which liabilities appeared on the credit report that would have to be explained to the lender. Those which had to be concealed were the outstanding mortgages obtained as part of the scheme, because all but one should have been paid off, but an increasing number of such mortgage remained outstanding as the scheme progressed.

11.     To make it appear as though the numerous mortgage liabilities reflected on the borrower's credit report related to properties other than Saxeborough or Lost Angel, the defendant caused the applications to falsely represent, in the "Schedule of Real Estate Owned", that the borrower owned numerous other real properties. According to assessors' and other public records, these addresses either did not exist, or if they existed, were never owned by the borrower.

12.     For each such property purportedly owned by the borrower, the defendant also caused the Schedule of Real Estate Owned section of the application to reflect a particular monthly payment and outstanding total liability. She chose monthly payment amounts and total liability amounts which matched those listed for the mortgage liabilities on the credit report, thus making it appear to the lenders that each address and liability listed on the Schedule of Real Estate Owned in the application corresponded to an item listed on the credit report. Since the credit report did not reveal the address of the property pledged to secure the mortgage liability, the lenders were led to believe that the false representations about the borrower's ownership and debt relating to the particular properties listed on the Schedule of Real Estate Owned corresponded to particular outstanding mortgage debts on the borrower's credit report. In fact, the outstanding

mortgage debts appearing on the borrowers' credit reports reflected the multiple outstanding mortgages against Saxeborough and/or Lost Angel fraudulently acquired as part of the scheme. In this elaborate deception, the defendant made it appear as though she, Craig Weingart, and John Gallegos owned numerous other properties whose value supported their substantial debt, when they did not.

13.    Each application thus substantially overstated the total value of the real estate owned by the borrower or borrowers. As the scheme progressed, the number of such falsehoods increased to conceal the number of outstanding liabilities generated by the ever-increasing number of mortgages obtained by the defendant, Craig Weingart and/or John Gallegos on their Saxeborough and Lost Angel properties as part of the scheme.

14.    The defendant also made it appear as though the properties which the borrower did not own, but were listed on the Schedule of Real Estate Owned, were rental properties. If the lender requested proof of rental income, the defendant created fraudulent leases to support the falsehoods. She either had the borrower sign these leases, or forged his signature on them.

15.    Many of the applications also falsely represented that the borrower had one or more personal bank accounts with substantial balances, when in fact, the borrower either had no such bank accounts, or had a substantially lower balances than those reported to the lender. If the lender requested proof of a bank balance, the defendant sent an altered bank statement to the lender to corroborate the falsehood on the application, usually putting someone else's name as the sender on the fax cover sheet, rather than her own.

16.    To satisfy the lenders' requirements, the defendant also signed numerous certifications in which she falsely represented that the information provided in her

9

applications was true; she had John Gallegos and Craig Weingart sign similar certifications when they were the borrowers.

17.    In all but two instances, Colorado County and Community Title, LLC ("CCCT"), or Real Estate Title Company, LLC ("Real Estate Title")served as the title insurance agent for the transactions. These companies purported to serve as independent and disinterested third parties to the transactions, when in fact, and unbeknownst to the lenders, the defendant ran them.

18.    CCCT and Real Estate Title submitted title commitments to the lenders as part of the application process. The defendant's training and experience as a title insurance producer enabled her to have commitments that contained all of the necessary information submitted to the lenders. These commitments provided false assurances to each new lender that it would acquire a first priority lien position when the purported sole existing loan against the property was paid off at closing. From the lenders' perspective, there was no reason to believe that the defendant, Waunita Weingart, was involved in the process, and the defendant never held herself out to the lenders as the title insurance agent. The title commitments the lenders received bore the stamped signature of John Gallegos, the stamped signature of the defendant's other son Patrick Gallegos, or the forged signature of one of the defendant's former employees, Thomas Rodman, Steven Weisberg, or John Eisenhauer. The commitments typically stated that there was one particular lien against the property, and recited that the deed of trust describing that lien had been recorded with the county clerk and recorder under a particular reception number. In fact, the deed of trust had not been recorded, the recording number had been fabricated, and there were numerous liens against the property.

10

19.     Prior to the closing, the defendant caused a payoff notice quoting an exact payoff figure to a single mortgagee to be provided to the lender. The mortgagee named was consistent with the sole mortgagee named in the title commitment which had been provided by the settlement agent, CCCT or Real Estate Title. Lenders typically required such payoff notices, such that those provided on these loans served to make the transactions appear legitimate.

20.     The defendant's son, John Gallegos, signed contracts on behalf of CCCT and Real Estate Title with the title insurance underwriter, Fidelity National Title Insurance Company ("Fidelity Title"). Even after Fidelity Title had terminated its agency relationship with Real Estate Title and CCCT, these companies sent some of the lenders documents which purported to show that CCCT and Real Estate Title were still authorized to act as Fidelity Title's agent, when in fact, they were not.

21.     In all but two instances, CCCT or Real Estate Title acted as the settlement agent at the loan closing. From the lenders' perspective, there was no reason to believe that the defendant, Waunita Weingart, was involved in the process as the settlement agent, and the defendant never held herself out to the lenders as the settlement agent. The individual acting on behalf of CCCT or Real Estate Title was variously named on the HUD-1 Settlement Statements and other documents typically executed at closing as Thomas Rodman, John Eisenhauer, or Steven Weisberg. Those individuals have all stated that they were not involved in these transactions, and that their signatures had been forged. Drawing on her experience as a settlement agent, the defendant was able to process the closing documents in a way that caused the lenders to believe the closing had been conducted legitimately and by someone other than her. For example, she regularly forwarded

notarized copies of the notes and deeds of trust to the lenders shortly after closings as required. The purported notaries, however, actually had nothing to do with the closings, and their signatures had been forged.

22.     The loan proceeds were wired to an account of the settlement agent, CCCT or Real Estate Title. The settlement agent was directed by each lender to apply a substantial portion of the loan proceeds to pay off the purported sole outstanding mortgage against the subject property. Unbeknownst to the lender, the defendant and one or more of her family members had signature authority over the various CCCT and Real Estate Title bank accounts into which the loan proceeds were wired.

23.     Instead of using the loan proceeds to pay off the prior outstanding mortgages, the defendant made transfers to a variety of her own and her family members' personal accounts and to numerous business accounts over which she and her family members had signature authority. She used the funds to support her lifestyle and to pay her own and her family members' personal bills.

24.     She also caused monthly mortgage payments on the growing number of outstanding mortgages to be made from the proceeds of the ongoing fraud. She caused these payments to be made from 2000 through May 2008 from a variety of her personal accounts, John Gallegos' personal accounts, and the CCCT and Real Estate Title business accounts. At first, the defendant made these payments by check; as the scheme progressed, she had them made by electronic transfers. These payments served to conceal the fraud from the lenders. As a result, the lenders, in all but one instance, did not discover the fraud until the defendant quit causing the monthly payments to be made.

25.     Aurora Loan Services, LLC, the servicer for two of the defendant's loans

realized that it was not in first priority lien position, and in March 2008, filed a civil suit against the defendant and others, alleging fraud. The defendant falsely represented to Aurora Loan Services' attorney that she would be receiving funds to pay off the two loans from legitimate sources.  Instead, she obtained additional loans as part of the same fraudulent scheme, and used the proceeds of them to repay Aurora Loan Services, LLC. As a result, Aurora Loan Services suffered no loss and dismissed its civil complaint. The defendant paid off only three other loans obtained in the scheme. In about May 2008, the defendant quit causing mortgage payments to be made on the remaining loans in the scheme, and they went into default.

26.     For each loan, the lender directed the settlement agent to record the executed deed of trust with the county clerk and recorder promptly after the closing. Such recording was required to protect each lender's first priority lien position. The defendant failed to have the deeds promptly recorded, and in all but a few cases, never had them recorded at all.  The lenders usually did not realize that their deeds had not been recorded until the loans went into default.

27.     In the manner described above, the defendant caused the following lenders to loan the following borrowers the amounts listed on the following dates. The borrowers pledged the named property as collateral. The following chart also lists ultimate victim and the amount of its loss, as calculated by reducing the principal unpaid balance by any amount recovered from the disposition of the collateral.

| Date | Borrower(s) | Original Lender | Loan Amount | Property | Victim | Loss Amount |
|------|-------------|-----------------|-------------|----------|--------|-------------|
| 8/3/00 | Craig A. Weingart | Jefferson Mortgage | $420,000 | 7766 Saxeborough | None | -0- |

|  | Waun R. Weingart | Group |  | Drive |  |  |
|---|---|---|---|---|---|---|
| 6/25/02 | John P. Gallegos | General Mortgage Corp. of America | $229,800 | 141 Lost Angel Road | GMAC | $219,664.82 |
| 1/27/03 | Alois C. Weingart | General Mortgage Corp. of America | $400,000 | 7766 Saxeborough Dr. | GMAC | $381,839.61 |
| 11/19/03 | Alois C. Weingart | 1st Mariner Bank | $420,000 | 7766 Saxeborough Drive | None | -0- |
| 2/13/04 | John Gallegos | 1st Mariner Bank | $400,000 | 141 Lost Angel Road | Am Trust NP SFR Ventures LLC | $381,040.01 |
| 2/19/04 | Alois C. Weingart | Liberty American Mortgage | $405,000 | 7766 Saxeborough Drive | None | -0- |
| 4/9/04 | Waun Weingart | Chase Manhattan Mortgage | $320,000 | 7766 Saxeborough Drive | JP Morgan Chase Bank | $305,725.52 |
| 4/9/04 | Waun Weingart | Chase Manhattan Mortgage | $410,000 | 141 Lost Angel Road | JP Morgan Chase Bank | $392,108.47 |
| 5/6/04 | Waun Weingart | Washington Mutual Bank | $400,000 | 7766 Saxeborough Drive | JP Morgan Chase Bank | $433,033.03 |
| 5/24/04 | Waun Weingart | American Wholesale Lender | $445,500 | 141 Lost Angel Road | Bank of America | $443,477.03 |
| 11/15/04 | Waun Weingart | Lehman Brothers Bank | $400,000 | 141 Lost Angel Road | None | -0- |
| 11/15/04 | Waunita R. Weingart | Ohio Savings Bank | $360,400 | 7766 Saxeborough Drive | Am Trust NP SFR Venture, LLC | $360,420.03 |

14

| 11/15/04 | Waun Weingart | Lehman Brothers Bank | $360,000 | 7766 Saxeborough Drive | None | -0- |
|---|---|---|---|---|---|---|
| 8/19/05 | Waun Weingart | Ameriquest Mortgage | $496,000 | 7766 Saxeborough Drive | Fidelity Nat.Title Ins. Co. | $400,000.00 |
| 8/25/05 | John P. Gallegos | Wells Fargo Bank | $400,000 | 141 Lost Angel Road | Fidelity Nat. Title Ins. Co. | $389,519.99 |
| 8/26/05 | Craig A. Weingart | World Savings Bank | $406,250 | 7766 Saxeborough Drive | Wells Fargo Bank | $434,801.26 |
| 8/31/05 | Craig A. Weingart | Ocwen Loan Servicing | $492,000 | 7766 Saxeborough Drive | Bank of New York as Trustee for Asset-Backed Certifica-tes, Series 2005-13 | $478,512.37 |
| 9/7/05 | Craig A. Weingart | Chevy Chase Bank | $400,000 | 7766 Saxeborough Drive | Fidelity Nat. Title Ins. Co. | $400,000.00 |
| 9/21/05 | Craig A. Weingart | National City Mortgage | $425,000 | 7766 Saxeborough Drive | Fidelity Title Ins. Co. | $412,069.22 |
| 10/7/05 | Craig A. Weingart | Irwin Mortgage Corp. | $386,500 | 7766 Saxeborough Drive | GMAC | $374,890.85 |
| 10/18/05 | Craig A. Weingart | Wells Fargo Bank | $412,500 | 7766 Saxeborough Drive | Wells Fargo Bank / Fidelity Nat. Title Ins. Co. | $621.54 / $400,000.00 |
| 12/5/06 | Craig A. Weingart | New Century Mortgage | $568,000 | 7766 Saxeborough Drive | Deutsche Bank, National Trust | $567,020.88 |

15

| | | | | | Co., as Trustee for the Registered Holders of Morgan Stanley ABS Capital I Inc. Trust 2007-HE7 Mortgage Pass Through Certificates, Series 2007-HE7 | |
|---|---|---|---|---|---|---|
| 12/22/06 | Waun Weingart | EquiFirst Corp. | $440,000 | 7766 Saxeborough Drive | US Bank as Trustee for MASTR Asset-Backed Securities Trust 2007-HE1 Mortgage Pass Through Certificates Series 2007-HE1 | $438,886.08 |
| 12/27/06 | John P. Gallegos | Wells Fargo Bank | $495,000 | 141 Lost Angel Road | Wells Fargo Bank | $488,052.54 |
| 1/23/07 | Waun R. Weingart | New Century Mortgage | $450,000 | 141 Lost Angel Road | Bank of America | $449,405.00 |
| 10/30/07 | Craig A. Weingart | World Savings | $86,300 | 7766 Saxeborough | Wells Fargo | $86,041.60 |

| | | Bank | | Drive | Bank | |
|---|---|---|---|---|---|---|
| 1/18/08 | Alois C. Weingart | Bank of America | $417,000 | 7766 Saxeborough Drive | Bank of America | $431,462.34 |
| 1/18/08 | Alois C. Weingart | Bank of America | $32,000 | 7766 Saxeborough Drive | Bank of America | $33,652.87 |
| 3/14/08 | Waun Weingart | Bank of America | $417,000 | 141 Lost Angel Road | Bank of America | $442,183.67 |
| 3/14/08 | Waun Weingart | Bank of America | $28,362 | 141 Lost Angel Road | Bank of America | $29,901.99 |
| 4/21/08 | John P.Gallegos | Bank of America | $417,000 | 141 Lost Angel Road | Bank of America | $433,034.74 |
| | | | | | TOTAL | $9,607,365.46 |

28.     The government's evidence which specifically relates to Count 3 would also include the following:

(a)     On or about December 22, 2006, EquiFirst Corporation loaned Waun Weingart $440,000.00 as a first mortgage to refinance her residence at 7766 Saxeborough Drive, Castle Rock, Colorado. On her loan application, she substantially overstated her income, representing that she earned $25,000.00 per month from her employment at Transaction Coordinator Services, when in fact, she received no income from that company and significantly less than that from any of her other companies. She falsely represented that she received $5,410.00 per month as rental income, when in fact, she did not receive rental income. She falsely represented that she had $35,000.00 in an account at First American State Bank, when in fact, the balance was $3,759.82. She also falsely represented that she owned real estate valued at $4,880,000.00, which included her residence at Saxeborough, as well as seven other properties, all of which were purportedly

17

encumbered. In fact, she only had joint ownership of the Saxeborough and Lost Angel properties, which were worth substantially less than $4,880.000.00.

(b)     The closing occurred on or about December 22, 2006, with Real Estate Title acting as settlement agent. The HUD-1 Settlement Statement and other closing documents bore the forged signature of Thomas Rodman, who had nothing to do with the transaction. On or about December 22, 2006 a wire transfer notification was sent from North Carolina to Guaranty Bank and Trust in Colorado that $442,830.71 had been wired from North Carolina and deposited to the Real Estate Title, LLC account at Guaranty Bank and Trust in Colorado.

29.     The government's evidence which specifically relates to Count 6 would also include the following:

(a)     On or about January 23, 2007, New Century Mortgage Corporation loaned Waun R. Weingart $450,000.00 to refinance 141 Lost Angel Road, Boulder, Colorado. On her loan application, she falsely represented that she earned $25,000.00 per month through her self-employment at Transaction Coordination Services, when in fact, she received no income from that company, and significantly less than that from any of her companies. She also certified the truth of that representation in a separate document to the lender. She falsely represented that she had $249,264.00 in an account at Wells Fargo Bank, and that she had $35,000.00 in an account at American National Bank. In fact, the true balances were $93.96 and $1,397.53, respectively. The defendant also falsely represented that she owned real estate valued at $8,890,735.00, which included her residence at Saxeborough and ten other properties. In fact, she had joint ownership of the

Saxeborough and Lost Angel properties, but owned none of the other nine properties. The application reflected that the defendant's information had been obtained by John Gallegos, an employee of G-4 Holding Mortgage Company, but the defendant simply provided the information herself and forged Gallegos' signature as broker.

   (b) The HUD-1 Settlement Statement reflected that Real Estate Title was the settlement agent. It and other closing documents bore the forged signature of Thomas Rodman on behalf of Real Estate Title. In fact, had nothing to do with the transaction.

   (c) On or about January 24, 2007, a wire transfer notification was sent from New York to American National Bank in Colorado that $452,735.44 had been wired from New York and deposited to the Real Estate Title, LLC account at American National Bank in Colorado.

  30. As a result of the defendant's fraud, the lenders who had financed the loans or their successors in interest lost approximately $9,607,365,46. This figure constitutes the sum of the unpaid principal balances they were owed, less any amount recovered by them from the disposition of the collateral pledged to secure the loans.

## VI.   ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

  The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. §3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing

Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

    A.    The base guideline is §2B1.1, with a base offense level of 7.

    B.    The loss is more than $7,000,000, but less than $20,000,000 (approximately $9,607,365.46) warranting a 20-level upward adjustment pursuant to §2B1.1(b)(1)(K). The offense involved sophisticated means, warranting a 2-level upward adjustment pursuant to §2B1.1(b)(10)(C).

    C.    The defendant used a special skill in a manner that significantly facilitated the commission and concealment of the offenses, warranting a 2-level upward adjustment pursuant to §3B1.3. The parties agree that there are no obstruction adjustments and the wire fraud counts are grouped together in a single group. §3D1.2(d).

    D.    The adjusted offense level would therefore be 31.

    E.    The defendant should receive a 3-level adjustment for acceptance of responsibility pursuant to §3E1.1. The resulting offense level would therefore be 28.

    F.    The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Known facts regarding the criminal history are as follows:

| Date | Case | Charges/Disposition | Sentence | Points |
|------|------|---------------------|----------|--------|
| 1/19/75 | Jefferson County, CO | Fraud -Insufficient funds check; disposition unknown | | 0 |
| 11/22/77 | Denver, CO | Felony Larceny; 2nd degree Forgery; disposition unknown | | 0 |

| 11/25/92 | Aurora, CO | Felony theft, 2nd degree Forgery of checks; disposition unknown | | 0 |
|---|---|---|---|---|
| 12/15/94 | Arapahoe County | Pled guilty to felony theft | Ct. 1: 3 yrs deferred sentence Ct. 4: 1 yr probation | 0 |
| 8/17/01 | Arapahoe County, CO County Court 01 R 101714 | Pled guilty to defective vehicle | Fine and costs | 0 |
| 10/31/10 | Arapahoe County, CO County Court 10 R 4127 | Pled guilty to expired plates | Fine and costs | 0 |

Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be 1.

G.      Assuming the tentative criminal history facts set forth above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.      The advisory guideline range resulting from the estimated offense level of 28 and the tentative criminal history category of I is 78-97 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level of 28 could conceivably result in a range from 78 months (bottom of Category I) to 175 months (top of Category VI). The guideline range would not exceed, in any case, the cumulative statutory maximums applicable of the counts of conviction.

I.      Pursuant to guideline §5E1.2, assuming an offense level of 28, the fine range would be $12,500-$125,000, plus applicable interest and penalties.

J.      Pursuant to guideline §5D1.2, if the Court imposes the term of supervised

21

release, that term shall be at least 2 years but not more than 5 years.

K.      The parties' position is that pursuant to §5E1.1 and 18 U.S.C. §3663A, the

Court must enter a restitution order for the full amount of the victims' losses, which is

$9,607,365.46, as set forth in Part V, Paragraph 27, above. The parties further agree,

pursuant to 18 U.S.C. § 3663(a)(3), that the defendant ~~should~~ shall be ordered to pay an

additional amount of ~~approximately~~ not more than $2,883,072.50 in restitution to entities to be identified

by the parties to the Court prior to sentencing.

The parties understand that although the Court will consider the parties' estimate,

the Court must make its own determination of the guideline range. In doing so, the

Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes the defendant

from asking the Court to vary entirely from the advisory guidelines and to impose a

non-guideline sentence based on other 18 U.S.C. §3553 factors.

The parties understand that the Court is free, upon consideration and proper

application of all 18 U.S.C. §3553 factors, to impose that reasonable sentence which it

deems appropriate in the exercise of its discretion and that such sentence may be less than

that called for by the advisory guidelines (in length or form), within the advisory guideline

range, or above the advisory guideline range up to and including

imprisonment for the statutory maximum term, regardless of any computation or position

of any party on any 18 U.S.C. §3553 factor.

## VI. ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises,

agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 3/13/13

Wauhita Weingart
Defendant

Date: 3-13-13

Martin Adam Stuart
Attorney for Defendant

Date: 3/13/13

Linda Kaufman
Assistant United States Attorney

Date: 3/13/13

Martha Paluch
Assistant United States Attorney

3/11/13

23